DAKOTA TRUST COMPANY, a Corporation, as Administrator of the Estate of Emil J. Headland, Deceased, Respondent, v. OLINE HEADLAND and Solvei Headland. OLINE HEADLAND, Appellant.

DAKOTA TRUST COMPANY, a Corporation, as Administrator of the Estate of Emil J. Headland, Deceased, Respondent, v. OLINE HEADLAND, Appellant.

(224 N. W. 220.)

Opinion filed February 28, 1929. Rehearing denied April 5, 1929.

*Lemke & Weaver,* for appellant.

*Conmy, Young, & Burnett,* for respondent.

BURKE, Ch. J. On the second day of April, 1927, the plaintiff, Dakota Trust Company, as administrator of the estate of Emil J. Headland, deceased, brought an action to determine adverse claims to lots 2 and 3, in section 6, township 138, range 48, and the southeast quarter (SE¼) of section 1, township 138, range 49; the southwest quarter (SW¼) of section 36, township 139, range 49, and the southwest quarter (SW¼) of section 1, township 138, range 49. The defendant, Oline Headland, claims to be the owner of lots 2 and 3, in section 6, township 138, range 48, the southeast quarter (SW¼) of section 1, township 138, range 49, and the southwest quarter (SW¼) of section 1, township 138, range 49, under a deed of conveyance made by Emil J. Headland, deceased, to said defendant, on the 10th day of September, 1924, and the defendant, Solvei Headland, claims to be the owner of the southwest quarter (SW¼) of section 36, township 139, range 49. The plaintiff claims that the said Emil J. Headland was indebted to Mark Andrews on a contingent liability in the sum of $2,499.20, and a direct liability in the sum of $1,311.56, which had been allowed by the county court; that Emil J. Headland was indebted to L. R. Baird, Receiver, in the sum of $3,347.19, and the sum of $1,130.43, created prior to 1923; that on November 28, 1926, for the purpose of redeeming the said lots 2 and 3, from foreclosure sale, plaintiff borrowed of the said Mark Andrews and L. R. Baird, $3,182.00, which was paid to the holder of the certificate of redemption. The plaintiff prays for an accounting for the rents and profits, that the title to all of said lands be quieted in the plaintiff, and that the claims of Mark Andrews and L. R. Baird be subrogated to the rights of the holder of the certificate of foreclosure sale and held to be a lien on the real estate redeemed, superior to the homestead claim of the defendant. The claims of the defendant, Solvei Headland, to the southwest quarter (SW¼) of section 36, township 139, range 49, were allowed by the court and there being no appeal, that land, and Solvei Headland are out of the case.

The trial court also found that the deed from Emil J. Headland to Oline Headland to lots 2 and 3, section 6, township 138, range 48,

and the southeast quarter (SE$\frac{1}{4}$) of section 1, township 138, range 49, was not fraudulent for the reason that the encumbrance against said land was greater than its actual value, and that the plaintiff was entitled to an equitable lien against lots 2 and 3, in section 6, township 138, range 48, for the money advanced in its redemption.

This leaves only the question as to whether the transfer of the southwest quarter (SW$\frac{1}{4}$) of section 1 was a fraudulent conveyance and the rents and profits of the same in case it was fraudulent.

The defendant, Oline Headland, appeals and asks for a trial de novo, specifying that the court erred, first, In finding that the deed was without consideration and fraudulent; second, That the market value of the land was $88 per acre; third, That the value of the use of the southwest quarter (SW$\frac{1}{4}$) of section 1, township 138, range 49, was $5 per acre per year, and finding that Oline Headland removed and appropriated the crops grown on the premises described for the year 1924; fourth, In the finding that the plaintiff advanced the sum of $3,102 in good faith for the redemption of defendant's homestead.

The trial court did not find the value of the southwest (SW$\frac{1}{4}$) of section 1, township 138, range 49 as a separate tract. He finds the value of all the land conveyed to Oline Headland to be $88 per acre, and in his memorandum opinion he bases the value of this land upon the appraisal value as fixed by the appraisers in the county court. In his memorandum opinion he states "that the deed from Emil J. Headland to his wife is valid as far as it conveys the 42-acre tract of land, without regard as to whether there was a good and valid consideration, as there can be no fraud as to creditors in the conveyance of the homestead by the husband to the wife." He continues as follows, viz.:

"There is considerable conflict in the testimony as to the value of this 190-acre tract, known as the 'Home Place' being lots 2 and 3, in section 6–138–48, and (SE$\frac{1}{4}$) of section 1–138–49. The witnesses for the plaintiff place the value of this land at from $100 to $110 per acre. The witnesses for the defendants place its value at from $55 to $60 per acre. The files in the estate of Emil J. Headland were offered in evidence, and according to the appraisement made by the appraisers, appointed by the county court, to appraise this property, the value fixed by said appraisers is $80 per acre.

"In my opinion, the valuation made by the appraisers comes very near being the true market value of the land. . . .

"The appraisers, appointed by the county court, found the value of this tract (the home place) over and above incumbrances, to be the sum of $3,700. I am of the opinion that this valuation is about correct."

Nowhere in his opinion does he refer to the value of the (SW¼), and the witnesses all testified, that it was not as valuable as the (SE¼) and lots 2 and 3, the home place, which was near the river, was higher, and better land having timber and all the buildings thereon. The value of the land was fixed by plaintiff's witnesses largely upon the buildings and dairy equipment. For instance, Mark Andrews in testifying about the home place is asked, "What was the reasonable market value of that property September 10, 1924, *considering the buildings on it"?* Answer: "I would say a hundred dollars per acre." None of the witnesses could testify to any land that was sold in the fall of 1924, for as much as $50 an acre, or at all, and in fact, there was no market for land. When asked on cross-examination, "Do you know of any land in Cass county that sold for as much as $50 an acre in 1924?" He said, "I am not in the land business, I haven't paid any attention to it. I know that land has not been selling readily the last five or six years." The other creditor, Ole Engen, testified that the land was worth $110 per acre. He is asked, if he knows of any land that sold for as high as $50 per acre in 1924, for cash? He answered, "I can't recall any particular piece in 1924. I can't answer that question." Later he says he bases the value of the land on the dairy equipment and the high state of cultivation. These two creditors are the only witnesses that the plaintiff has on the value of the land, and it is clear from the memorandum opinion that their testimony had little weight with the trial judge.

Mark Andrews in his sworn petition for letters of administration states that the total value of all said real estate over incumbrances does not exceed the sum of $3,000, and that the annual rents of the real estate are of the probable value of $300. The home place being eliminated, it leaves the bare (SW¼) without any buildings. It was stipulated that there was against the said (SW¼) one mortgage for $6,500, and one for $1,927.22 aggregating $8,427.22, and the record

shows that there was also $405.46 taxes, aggregating $8,832.68 besides interest. The report of the appraisers shows that there was $10,427.22 against it and that it had no value above incumbrance, although the defendant, Oline Headland had paid $150 interest on the mortgage. It is, of course, well settled that if property is incumbered for more than its actual value an action will not lie to set a conveyance aside. There must be property available for the satisfaction in whole or in part of the creditor's claim or the conveyance will not be set aside. 27 C. J. 417, §§ 18 and 20; 12 R. C. L. 505.

It is quite apparent from the action of the creditors in waiting one year and seven months before petitioning for letters of administration, and waiting two years and seven months before bringing any action, to recover property upon which the defendant had paid off the mortgages, and to compel her to account for the rents and profits of the land which had been lost under foreclosure, that the creditors knew that there was no equity in the (SW¼) over and above the incumbrance, and they are not injured by the conveyance.

If the value placed upon the "Home Place" by the appraisers is, as the trial court states, the reasonable value of the land, then the value of the "Home Place" would not be $88 per acre, but a little less than $80 per acre, and if that is the value of the "Home Place," we are of the opinion that under all of the evidence the (SW¼) which is conceded to be lower and poorer land with no buildings would not be reasonably worth more than $50 per acre at the time of the transfer, which is less than the incumbrance against it, at the time of the transfer.

In the case of Ford v. Brown, 54 N. D. 281, 209 N. W. 386, an action to set aside a sale of 320 acres of land in Cass county near Casselton, all good Red River Valley Land with good buildings, the trial court found that the reasonable market value of said land at the time of the transfer did not exceed the incumbrance, past due taxes, and interest existing against the land in the sum of $12,000, and such finding was affirmed by this court. See also Stangler v. Kanan, ante, 29, 220 N. W. 443. The memorandum opinion does not mention intent and the decision is based on want of consideration alone.

We are of the opinion that the evidence does not show a fraudulent conveyance in the instant case, first, because the incumbrance against the property was greater than its actual value. Second, there was a

consideration, and the evidence shows that the defendant, Oline Headland, not only did not intend to delay and hinder the creditors, but on the contrary, on the death of her husband she proceeded to pay his creditors.

On the question of consideration, Oline Headland testified, "four or five years before I was married I took out an insurance policy; after my marriage my husband paid the premiums, that the money he paid for premiums was due me. It was a fifteen-year $1,000 policy and was paid to me. I loaned it to my husband. I asked him for a note. He never refused to give me a note but you know how it is between husband and wife. He was to pay interest. He never paid interest. The agreement was that it would be paid back with interest. My work and efforts and strength went into that home."

Mr. Lacy who drew the deed testified, "that Mr. Headland said I borrowed some money of my wife that she got on an insurance policy and wanted to deed land to her in payment of what he owed her."

Mr. Hansche testified in substance as follows: "He asked me to have certain property transferred to his wife and a bill of sale in payment for what money he had borrowed from her, some insurance money amounting approximately to $1,800."

It is difficult to understand how the trial court found there was no consideration. It is conceded that there was an insurance policy for a thousand dollars but it is claimed that since the husband paid the premiums after marriage the amount the defendant paid is too indefinite and uncertain to constitute a consideration, but while the husband was paying these annual premiums, the defendant, from 1910, the date of her marriage, until the death of her husband in 1924, was, as she testified, putting her work, her efforts, and her strength into that farm. She helped to conduct the farm and when her husband wanted to quit the dairy business she prevailed on him to continue in it and when her husband died he left her with six children ranging from three years to twelve years of age. She earned many times the premiums on the insurance paid on the insurance policy. The proceeds of that policy belonged to her and she had a right to loan it to her husband. Such a loan would be an honest debt and under the statutes of this state, the husband had the right to prefer his wife as a creditor in the payment of an honest debt.

At the time of the execution of the deed, and for the same consideration E. J. Headland by bill of sale conveyed all his personal property to his wife, Oline Headland, and plaintiff brought a separate action to set the sale aside as fraudulent, and the trial court in his memorandum opinion in the real estate case, holds there was no consideration for the sale of the personal property and therefore void. An accounting before a referee was had upon which the trial judge made findings, and from judgment thereon, the defendants appeal demanding a trial de novo.

The evidence in the real estate case was admitted in this case; they were argued together and are so connected that they may be considered together by this court. Since the incumbrance against the S. W. $\frac{1}{4}$ was more than its actual value we are of the opinion that there was a consideration. The personal property was also mortgaged to limit. There was $850 against the horses and some of the machinery, $1100 against the tractor, $169 against a third interest in a separator, $489 against a truck, $396.83 against other machinery, $1970.50 against the dairy herd, $196.95 interest on the mortgage, $88.06 taxes on personal property, and for last sickness and funeral expense of E. J. Headland, $751.85, amounting to $5,842.19 against the personal property.

Plaintiff introduced in evidence a statement made by E. J. Headland to the First National Bank of Fargo in 1923, for a loan in which he states, that all his machinery is of the value of $2,000, and live stock of the value of $3,000, the total value less than the charges against it when the bill of sale was executed. Another statement fixing the value of 20 cows at $70 per head, 12 two year old heifers at $50 per head, one bull $100 making the value of the entire herd $2100. The defendant paid on the mortgage $1970 and $196.95 interest amounting to $2,266.75. Plaintiff offered another statement in which 40 head of Holsteins are valued at $2000 or $50 per head, and 14 horses at $700. There were only eleven horses when the sale was made, four of which died and the defendant purchased three horses to replace them. The machinery and the horses were all old, two of the cows died and two were sold, one for $35 and one for $40. The bull was purchased at Hickson right in the same neighborhood for $75 as a two year old.

It is the contention of the appellant, that the defendant is entitled

to all the household furniture as absolute exemption, and to $1500 additional exemptions under § 8725, Comp. Laws 1913, which reads as follows:

"There shall also be set apart absolutely to the surviving wife or husband or minor children all the personal property of the testator or intestate which would be exempt from execution, if he were living, including all property absolutely exempt and other property selected by the person or persons entitled thereto to the amount in value of fifteen hundred dollars according to the appraisement and such property shall not be liable for any prior debt of the decedent except the necessary charges of his last sickness and funeral expenses of the administration when there are no other assets available for the payment of such charges."

The defendant claimed all the personal property as exempt in the county court, in the district court, and in this court, and the trial court allowed the household furniture as absolute exemptions, but denied the additional exemptions. The defendant is entitled to all of her exemptions. Fore v. Fore, 2 N. D. 260, 50 N. W. 712; Deeble v. Alerton, 58 Colo. 166, 143 Pac. 1096, Ann. Cas. 1916C, 863. In the latter case the court said: "The 'widow's allowance' provided by our statute is a gracious and deserved tribute of the law to wifehood. It is a first charge upon the estate and so made to provide for the comfort and sustenance of the widow and children pending administration and before distribution. It therefore cannot be a part of that which is to be distributed. It is designed not only as a protection for the widow and children as against want or humiliation, but a protection for the state as well."

It is clear that there is not $1,500 worth of personal property over and above the charges against it, and the fact that the defendant paid off the mortgages against the property out of money she received on an insurance policy on her husband's death will not militate against her in a court of equity. The charges against the personal property together with the exemptions to which the widow is entitled is certainly more than the value of the property, and the sale would not be invalid even if there was no consideration.

But there is another reason why the plaintiff cannot recover in these actions. E. J. Headland was a stockholder and a director in the

Scandinavian American Bank. The creditor, O. L. Engen, was receiver of the Scandinavian American Bank in 1923, and took from Mr. Headland a promissory note payable to the Scandinavian American Bank for the sum of $2,089.33, which note is a part of plaintiff's claim. He testified that he knew E. J. Headland, knew his place, knew that the property was his, had examined the records and knew that the property was mortgaged. In November 1924, shortly after Mr. Headland's death the other creditor, Mark Andrews, went out to see Oline Headland on the farm, told her that the silo company in which he and E. J. Headland were interested was required to pay certain obligations of said silo company, or the property which had been put up to secure such obligations would be foreclosed on, and lost, and the defendant, Oline Headland at that time paid him $625. Both creditors knew that Oline Headland was living upon this land with her children, claiming to be the owner. They knew that everything that E. J. Headland owned was mortgaged to the limit, and there was nothing that they could touch or realize on in the payment of their claims that was not heavily mortgaged, and they permitted Mrs. Headland to remain on this land knowing that she was paying her husband's debts, paying the mortgages on the personal property, taxes on the land, interest on the real estate mortgages, paid for the seed from which the crops in 1924 were grown, paid personal property taxes, in fact, paid out on her husband's debts $9608.94 in actual cash.

One year and seven months after the death of E. J. Headland they petitioned for letters of administration, and two years and seven months after his death, when all the real estate had been lost, except the 42 acres, they came into court, and without showing any excuse for delay ask a court of equity to turn over to them the property which the defendant had freed from incumbrances and for rents and profits. 27 C. J. 764 § 65, states the rule as follows:

"Independently of a statute of limitations, or of the expiration of the statutory period, the right to institute a suit for relief against a fraudulent conveyance may be lost in equity by the laches of the complainant. . . . The doctrine of laches has been frequently applied where the granting of the relief sought would work prejudice to defendant, as where the complainant has slept on his rights and allowed

defendant to make valuable improvements or make other expenditures in reliance on his title. Laches is not, like limitation, a mere matter of time."

Pomeroy's Equity Jurisprudence, 3417, § 1442 reads as follows:

"The true doctrine concerning laches has never been more concisely and accurately stated than in the following language of an able living judge: 'Laches, in legal significance, is not mere delay, but delay that works a disadvantage to another. So long as parties are in the same condition, it matters little whether one presses a right promptly or slowly, within limits allowed by law; but when, knowing his rights, he takes no step to enforce them until the condition of the other party has in good faith become so changed that he cannot be restored to his former state, if the right be then enforced, delay becomes inequitable, and operated as an estoppel against the assertion of the right. The disadvantage may come from loss of evidence, change of title, intervention of equities, and other causes; but when a court sees negligence on one side and injury therefrom on the other it is a ground for denial of relief."

Hammond v. Hopkins, 143 U. S. 224, 36 L. ed. 134, 12 Sup. Ct. Rep. 418: "Each case of laches must necessarily be governed by its own circumstances; though the lapse of a few years may be sufficient to defeat the action in one case, a longer period may be held requisite in another."

"Laches is inexcusable delay in asserting a right; an implied waiver arising from knowledge of existing condition and an acquiescence in them." 21 C. J. 211.

"From acquiescence, the court may presume assent to the adverse right." 21 C. J. 228, § 223.

"If on account of inexcusable delay, the parties cannot be placed in statu quo and the enforcement of the right would work inequity, relief will be denied because of laches."

The conduct of the creditors in the instant case amounts to an acquiescence in the validity of the transfer of both real and personal property, and it is impossible to grant the relief prayed for by the plaintiff without doing great injustice to the defendant and her six minor children, and this a court of equity will not do.

The judgment in the action setting aside the bill of sale is reversed, and the action dismissed with costs to the defendant.

We are of the opinion that the plaintiff is entitled to be subrogated to all the rights of the holder of the certificate of sale on foreclosure for the $3102 advanced to redeem the 42 acre homestead. The defendant had the benefit of this redemption, and since the lien under the certificate of foreclosure was superior to the homestead interest of the defendant it follows that the claim of the plaintiff as the equitable owner of the certificate of redemption is likewise superior to the homestead interest of the defendant. Levy v. Martin, 48 Wis. 198, 4 N. W. 35; Stewart v. Stewart, 90. Wis. 516, 48 Am. St. Rep. 949, 63 N. W. 886; Hughes v. Thomas, 131 Wis. 315, 11 L.R.A.(N.S.) 744, 111 N. W. 474, 11 Ann. Cas. 673; Wilson v. Hubbard, 39 Wash. 671, 82 Pac. 154; Heuser v. Sharman, 89 Iowa, 355, 48 Am. St. Rep. 390, 56 N. W. 525; Gordon v. Stewart, 4 Neb. (Unof.) 852, 96 N. W. 624. The plaintiff is entitled to an equitable lien on lots 2 and 3, in section 6, township 138, range 48, in Cass county, N. D., subject to defendant's right to redeem by paying to the plaintiff on or before November 1st, 1929, the sum of $3,102, together with interest thereon at the rate of 6 per cent per annum from and after November 27, 1926 to date of payment. If redemption is not made as herein provided on or before the 1st of November 1929, the plaintiff will be entitled to judgment quieting title to the said property in the said plaintiff for the use and benefit of the said L. R. Baird and Mark Andrews and it is so ordered. As thus modified the judgment is affirmed each party to the real estate action paying their own costs in this court.

Birdzell, Nuessle, and Burr, JJ., and McKenna, Dist. J., concur.

Mr. Justice Christianson did not participate, Honorable Geo. M. McKenna, Judge of Third Judicial District, sitting in his stead.